Before I start, I neglected to ask, is there a warning light? Yes. And it's at two minutes? Two minutes. Thank you. May it please the Court, my name is Corrine Chandler, and I represent the appellant Debra Letvinuck. Thank you. I'd like to reserve three minutes of my time. In the prior unpublished decision from this Court, the Ninth Circuit gave express instructions to the trial court. The instructions relevant to this appeal concerned Aetna's other failures and why those failures required a reduction in deference. The claim deficiencies identified by this Court are now published law in the cases of Montour v. Hartford and Salama v. Honda. They are that, one, failure to consider a Social Security award is evidence of conflict and requires a reduction in deference. The Salama Court also held that a failure to consider consistent, its holding was consistent with that of Metlife v. Glenn, that a failure to consider a Social Security award as evidence of disability is evidence of abuse of discretion because the administrator has not considered reliable, credible evidence of disability. That is consistent with Justice Roberts' concurring opinion in the Glenn case. The second proposition that the two published cases now stand for is that if there is going to be a denial based upon the absence of information, there must be a clear and unambiguous request for that information by the administrator. That did not happen here. Despite the express instruction from this Court and the unambiguous precedent in this circuit, the trial court stated that it was giving broad deference to Aetna's claim decision. This was an error. I'd first like to discuss the issues concerning the Social Security award. The trial court, despite the instruction from this court, the trial court refused to lower its deference. I'm a little confused. You're saying that the orders that came down from the Ninth Circuit were to decrease deference. That's correct. And in the district court, you're saying, said, no, I'm not. That's correct. But that was after further evidentiary. Well, the evidence in the case has not changed. I read what we said, and I may be wrong, as take another look at this. Not you must. And the district court read it that way and took another look at it. Went through all the factors about which you're talking and said, okay, I've done all of that, but I still come out. Here's where I come out. Two points on that, Your Honor, is that, first of all, I believe that the Ninth Circuit instruction to the district court was consistent with precedent in this circuit. Read the exact language that you say ordered the district court to reduce. I would. The district court also erred when it did not sufficiently consider certain of Aetna's other failures, which would affect the skepticism to be used by the court in its review. And then it went on to name the three things. It did not say may or in its discretion. It said would. And then later in the. I didn't get which would what? Which would affect the skepticism. So we've sent it back, though, for sufficient consideration. I believe that there was. And it is a process of judging. I agree that Ninth Circuit was not telling the district court you must decrease your deference by 95 percent. It is a process of judging. But in this circuit and under the Supreme Court decision of Metlife versus Glenn, the facts that occurred in this case and that the Ninth Circuit told the district court were other failures. That may be true. I mean, we may decide that the district court blew it on the merits. But it just seems to me that the Ninth Circuit said sufficiently consider this stuff. Not you must reduce the amount of deference that you give to the company. I interpreted it as that it was consistent with the precedent in this circuit that these are reasons. These are our claims handling activities that warrant a reduction in deference. And there is another part of the opinion where I do agree that the district court was or the Ninth Circuit was advising the district court. At the end of the opinion where it said perhaps the district court's reference to Jordan and lack of concern with the other apparent conflicts did not make a difference in this case. And then it instructed the district court and it said, however, we are far from sure that that is true. Thus, we vacate the decision so that the district court can properly apply a Beatty and clearly consider Aetna's conflict of interest without imposing undue burdens on Levitner. There was the evidence that we argued required a reduction in deference. It is a subject of this appeal. It is the evidence that is in the record. It is the same record that is before the Ninth Circuit two years ago. The evidence has not changed. And this goes to the Social Security Award. Aetna has argued that the Ninth Circuit perhaps did not understand the true facts of this case when it rendered its decision, but that facts and the evidence haven't changed. The Ninth Circuit's opinion recognized the difference between the Glenn case and this case and said that the whole plan, the whole structure of the plan requires some consideration of the Social Security Award as evidence of disability. And that did not happen. The plan here consists of Aetna's insurance policy, the insurance policy that was drafted by Aetna. It requires a participant to apply for Social Security benefits. It states that Aetna has the right to require proof that the claimant has made application and appealed it all the way up to the ALJ level. The claimant may not waive their right to Social Security benefits without Aetna's consent. Is your argument that, as a matter of law, the award of Social Security benefits demands that Aetna regard your client as totally disabled? Absolutely not. It is evidence of disability, and it must be considered. What does that mean, evidence of disability? It would be, well, in this case, it's powerful evidence of disability, as the Saloma Court would hold, because it is evidence that an independent agency has determined that Ms. Levidnik is unable to perform any job, any job. In this case, the Aetna plan, the standard under the Aetna plan was whether she was unable to perform her own job. And in that, under those circumstances, the Saloma Court has called the award of Social Security benefits. This is how it describes it. It says, evidence of a Social Security award is of sufficient significance that failure to address it offers support that the plan's administrator's denial was arbitrary and abuse of discretion. It should have been considered. In this case, it was not. It was noted in the record, and Dr. Anfield dismissed it by saying the data and analysis in support of the award was not in the plan. So it was dismissed. And I also want to point out that Aetna's, the ties between the Social Security awarded benefits and this plan did not stop with the structure of the plan. In September of 2005, one month before it terminated benefits under the Your Occupation standard, Aetna wrote Ms. Levidnik, and it told her directly, it appears to us that you are eligible for Social Security benefits. So Aetna was telling Ms. Levidnik, you are, it appears to us that you are eligible under the Any Occupation criteria for disability benefits. We also believe that the court committed clear error and a factual error in holding that Aetna timely communicated any issue regarding the evidence supporting the Social Security award to Ms. Levidnik. We have set forth the timeline regarding the whole Social Security issue in our reply brief. But just basically, Ms. Levidnik submitted her Social Security award to Aetna before her benefits were terminated. She submitted it as evidence of her disability. Dr. Burton reviewed her file and did not mention the award. The termination letter, which was a word-for-word quotation of Dr. Burton's medical report on the substantive issues, did not mention the Social Security award. Ms. Levidnik appealed that decision in November for unknown reasons, and she had 180 days to appeal the decision. For unknown reasons, Aetna shortened the appeal to, and told her she must get all of her evidence in by December. She asked for more time, and they, quote, extended, close quote, her time until January. This was still far short of the 180 days. They told her you have to have all your evidence in by January 8th. Well, that was the day that she received her file from Aetna. The file did not have any information about her Social Security award. She would have no way of knowing that it was dismissed. The dismissal didn't occur until Dr. Anfield and Dr. Schroeder reviewed the file on appeal, and that is when Dr. Anfield noted the existence of the award, but dismissed it by saying the data and analysis was not in the file. And by this time, her appeal is complete, and so she cannot cure any deficiencies in the record regarding what the evidence that was relied upon by the Social Security administration. The trial court committed clear error there. I'd also like to point out that the Solano court highlighted a different deficiency that also applies in this case, and that is Aetna did not give copies of Dr. Anfield's or Dr. Schroeder's report to Ms. Levitnick before it made its final decision on appeal. The Solano court has held that that is error, and it deprives a claimant of their statutory right of a full and fair review under ERISA, that if there is evidence that the administrator is going to rely upon, that evidence must be given to the claimant before there is a final decision so she can rebut it, because this is a closed record. She can't rebut it in this case. Was she represented by counsel at this stage? She was not. Okay. She was on her own. So your first issue is the Social Security, and the second is failure to give the documents. What was the other one? There are two other issues. We believe that the trial court did not follow this court's instruction to reduce its deference based upon Aetna's failure to clearly communicate its need for objective neurological testing. In the Ninth Circuit, it was pointed out that this was one of the other failures of Aetna. Nevertheless, in the trial, based upon the same record, the district court expressly held that Aetna did, however, clearly inform plaintiffs and her doctors that it needed objective medical evidence to support plaintiffs' complaint of a disabled and cognitive impairment. In support of that, it cited a piece of evidence that the parties have been disputing for the past four years, and that piece of evidence is at 819 of the excerpts of record. It is also 180 in the administrative record. Aetna claims that this piece of evidence, this document, at various times Aetna has said it was a direct request to Dr. Weiner for objective evidence supporting it has characterized as impairment, disability, and limitations and restrictions. If one looks at that document, that is not what that document is. It is a claim record indicating that a voicemail message was left at Dr. Weiner's office. It did not ask for objective evidence of disability or impairment or restrictions and limitations. It asked, excuse me. Did Aetna's physicians have an independent duty to obtain neurological testing at any stage? Pardon me? I'm sorry. Did the Aetna physicians have an independent duty themselves to obtain additional neurological testing? Well, it certainly would have been helpful. They had the right, under the plan, to order an independent medical examination. And Your Honor's point does go directly to a point that the law ---- Well, that may have solved some of the problems. It certainly would have. One way or the other. Especially since Dr. Anfield, when plaintiffs did provide evidence of the Serial 7 testing that was conducted by her doctor, Dr. Weiner, Dr. Weiner said she did do it accurately, but she did it much slower. And much slower than expected. And what happened there is Dr. Anfield said, well, yes, that is what Dr. Weiner reported. But the validity of that test result was not observed. Okay. You didn't talk about the structural error or anything of that nature. Pardon me? You didn't talk about the structural prejudice or anything of that nature. So those weren't issues that you focused on in your argument. I'm not quite understanding. Well, the ERISA plan, you know, you have the ERISA plan where you have both the insurance companies and ---- Right. That's both. That's not something you've talked about. No. I believe that that ---- That's pretty standard. Yes, it is standard. And in this case, Aetna's liability under the long-term plan would have taken effect less than a month, three weeks. But that's standard, isn't it? Yes, it is. It is. That's just every ERISA plan. That's the way it is. How did Aetna benefit from the Social Security award? Aetna would benefit because ---- How did Aetna benefit, not how would Aetna benefit? At the time of the termination of benefits, Aetna did not receive a benefit of the Social Security award because ---- So there was no benefit. Because Aetna was not paying the ---- its own funds would not have been implicated until three weeks later. So that's a substantial difference from the Montour case, is it not? I ---- In the Montour case, we pointed out that that provided an immediate offset, which halved the insurance company's liability. We don't have that problem in this case. The Aetna's liability would have been implicated within three weeks. The claim was already in long-term disability review. The question is whether the administrator is acting inconsistently, whether when it is structuring the plan so that the Social Security award will give it a financial benefit, and when it is telling plaintiffs it appears you are eligible for Social Security benefits, and then it will not consider that award. Well, you say it didn't consider it. The reviewing physicians mentioned the award and an awareness of it. Is that right? The ---- Dr. Burton did not. Did not? He did not before the appeal, or excuse me, before the termination. He did not mention it. The physicians who mentioned it were Dr. Anfield and Dr. Schroeder on appeal. Okay. But they did mention it. They mentioned it. So it was in the record. Oh, yes. And did Aetna inform your client that the Social Security Administration had a different criteria for approving disability claims, explaining she must be disabled? They had their own definition. Was that explained too? That was the reason given to Ms. Levitnick after all of the appeals or her appeal had been exhausted. But that suggests to me that they did consider it. That, to me, it ---- You seem to say they just dropped the guillotine on it. There's no evidence that anybody considered it, but it's in some of the physicians' reports, and Aetna explained why it didn't consider that to be binding, and Black and Decker would agree with that. Two points on that. What was told her in her appeal letter was that the data and analysis in support of the award were not in the file. That, to me, suggests that the ---- The data and material in support of the SSA award. That's correct. What Dr. Anfield said was there is this award of Social Security. However, the data and analysis in support of that award are not in the file. Did they tell her there was a disability definition that was different between Social Security and this policy? Apparently that was told to her in a phone conversation after the appeal was over, and if that is the case, that should have tipped the scale in her favor because the difference in the two definitions is that the Boeing plan definition is more lenient than the Social Security definition for disability. The district court said, quote, even assuming Aetna should have given further consideration to the SSA award, nothing about Aetna's failure to do so suggests to this court that Aetna's decision-making was motivated by a conflict of interest or that Aetna's ultimate determination should be viewed with enhanced skepticism. Your response to that? My response to that is that it sounds to me like the district court is looking for a bad faith or improper motive, one involving symptom, and that is what the proper test is, is whether the financial interest of Aetna has implicated or tainted the claim process, and here it has. All right. You're over your time. We'll allow you to respond. We've wanted to explore this thoroughly. We'll hear from the other side. Thank you, counsel. Thank you. May it please the court. Good morning, Your Honors. Lisa Garner on behalf of the Pele's Aetna Life Insurance Company and the Boeing Company Employee Health and Welfare Benefit Plan. With respect to the Social Security Award, since there's been a lot of discussion about that, there is no doubt that Aetna and its medical reviewers considered the Social Security Award. It's mentioned throughout the record. The district court also considered what Aetna did with the award as instructed by the Ninth Circuit. The instructions from the Ninth Circuit to the district court were to clearly consider these issues, and that is exactly what the district court did. Aetna did not benefit from the Social Security Award. Aetna never instructed the plaintiff to go apply for benefits. Unlike in Montour where in the initial... But I thought the paperwork did. No. The plan itself says at some point you must apply. Right. But ordinarily what happens, such as in Montour, there's a letter from the claims administrator saying, okay, now you have to apply. I don't really see what the difference is. If it's in the plan, who cares if she was personally told? Well, ordinarily it often occurs that there is a letter to... Well, this isn't ordinarily. Well, this is because in this case there was never a requirement. Aetna did not say to her, you have to go apply. But the plan did. The plan does. So what's the difference? Well... I mean, I think you're losing on that one, but go ahead. Okay. The follow-up question is, so what? I mean, she's asked to apply for Social Security benefits. Does that mean that they have to follow the conclusion that's reached by the Social Security Administration? Absolutely not. In fact, the Black and Decker case says you don't have to. It would seem to me that it would always be good policy if you have a claim to apply for Social Security benefits, whether it's going to affect your long-term disability or not. Well, that is correct. There's a lot of other benefits to applying for Social Security disability other than what is the concern that has been expressed in the MetLife case versus Glenn, which is there's a benefit to the insurance company if they apply and get something. Well, what follows in your view from your statement that Aetna never asked her to do it, therefore... Well, it wasn't a concern of Aetna, and Aetna didn't get a benefit. And the reason I say that is it distinguishes this case from that of Montour and Glenn and Saloma, in which those cases the insurance company was extremely active in having the claimant apply for Social Security benefits. In this case, there wasn't that activeness. And that does seem to be the concern of those courts is, hey, you were actively encouraging application. It wasn't just written in the plan, but you were actively saying, go apply, go apply, go apply. And by the way, in Glenn, I think they even paid for an attorney in that case to help them. I'm not sure if it was in Glenn or in Saloma, but none of that occurred here. And that distinguishes this case and the treatment of this claimant from the Montour and Glenn case. It's a difference. I don't know whether it distinguishes it, but go ahead. The appellate also, the appellate would like this court to only focus on the treatment of the Social Security award by Aetna in a vacuum. But why don't you summarize for us again, in what respect did Aetna consider the Social Security award? It was noted that it received it. It was given to the medical reviewers. Aetna gave it to the medical reviewers? Two of the medical reviewers mentioned having it, yes. Aetna gave it to them? They had it, yes. You said Aetna gave it to them. Well, Aetna has to give the medical reviewers the documents to review, so yes. So you're assuming Aetna gave it to them? Well, I don't know how else they would get it. Okay. I don't know how else they would get the Social Security award. It's in the claim file. Dr. Burton did not mention having the Social Security award, but he had the entire claim file, and it was at that time in the claim file. But he was the Dr. Burton was the first reviewer prior to the initial denial. Dr. Schroeder and Anfield handled the appeal, and there's an argument here that those reports weren't provided to the plaintiff prior to the appeal decision. There's absolutely no requirement that they have to have that. When she asked for a file, she got everything in that file. She had a conversation with Aetna following receipt of the file, and in that conversation she was asking questions, and Aetna said, we noticed that there was, you know, you had this issue of possible depression. You know, did you see a psychiatrist? Were you ever requested to see a psychiatrist? And she said no, and Aetna said, we'd like to do some further review. Could you have us have the dofus visit notes from Dr. Spain, who is her psychotherapist? And that was on January 13th, and on January 19th, Ms. Levinick sent Aetna those records to have a further review. Aetna did a further review. Aetna went farther than her own treating physicians in trying to decide, maybe she's not, maybe she is disabled due to depression, which none of her doctors suggested. But Aetna went farther and checked into this. During the time she had the discussion with Aetna about the file, she had the file, and she never said, you know, something's missing from the file. The whole idea that Aetna did not have the same records as in the Social Security Award, as the Social Security Administration in considering her disability, is very much a red herring. There's no doubt that Aetna had the same records as the Social Security Administration, and this, I think, is evident from the record. First, the appellant never made any move to augment the administrative record, which would be expected if there had been information to submit. Second, when submitting documentation in connection with her appeal, appellant informed Aetna that she was providing the same report that Dr. Spain had submitted to the Department of Social Security Services in connection with her application for disability benefits. That's at excerpts of the record 1041. Further, appellant herself informed Aetna when she submitted medical records and other evidence in connection with her appeal, quote, this is the last of the data I can provide for your consideration at this time. Please begin your review process now, unquote. That's at ER 1031. It is disingenuous for appellant to argue that Aetna should have specifically asked for the same information that was submitted to the Social Security Administration. Aetna logically could assume that it had at least, if not more, of the same information. In addition, with respect to the issue of the 180-day appeal, Aetna gave plaintiffs all the time she wanted. In fact, Aetna even at one point suggested to her, withdraw your appeal, you have 180 days, you can get more information. And plaintiffs said, no, I don't want to do that. From the very first letter, with respect to her short-term disability benefits, Aetna explained to plaintiffs how it was determined disability in her case. And it was explained to the plaintiff that it isn't just her treating physicians, it is going to be the medical professionals, Aetna's disability analysts, in combination with the definition of disability as put in her plan. Aetna never told plaintiffs that the Social Security Administration had more stringent or less stringent criteria. Aetna told plaintiffs it had different criteria. And an appellant in the responding brief has suggested to Ms. Levinick that the criteria was more stringent. Aetna never said that. Aetna told her at ER 944, I believe, that the criteria was different. Do you have that language that you can read to us? I do, Your Honor. It is at ER 944. And from what are you reading? I'm reading from the administrative record, excerpts of the record, page 944. And what is it that you're reading? It is a claim note from a telephone conference with Ms. Levinick. And who wrote the claim note? The person at Aetna who handled the appeal. All right. Please read it. I'll read the whole note. It says TCF telephone conference from EE employee, that's Ms. Levinick, stated she wanted to know what her next steps were, told her that if she has an attorney and she wants to submit more medical, we would certainly review on reconsideration. EE stated that she has already been approved for SSDI and doesn't understand why we are not approving her, told her that SSDI has a different criteria for approving disability claims versus Aetna works through a definition of disability written by her employer. Please understand that the definition states that she must be disabled from doing her own occupation, any employer, not just with Boeing. And that's what it did. It didn't say more stringent. Thank you. You've covered your case pretty well in your brief. What else would you like to tell us? Your Honor, the district court considered all of the instructions from the Ninth Circuit, carefully weighed everything, did the weighing, did the consideration and reached a determination that was not tainted by clear error. We review that de novo or for clear error? I believe you review it for clear error and if you would like me to address that issue, I would be happy to. Why don't you? In her opening brief, Appellant mentions de novo review, but she cites absolutely no authority or reasons why this court should review the district court's decision de novo. In fact, the argument Appellant makes throughout her opening brief is that the district court committed clear error. In her reply brief, Appellant again mentions her belief that de novo review is appropriate, but never provides any legal authority for this proposition. It is well settled that the failure to argue this issue specifically and distinctly in the opening brief results in a waiver of it. That's Omega versus Costco. Well, but what is the authority that tells us what the standard of review is? Is there none or is there some? No, there is authority. In fact, it was cited in the responding brief and I could also say here in Abadie, it says in the Abadie case, 958 F3rd 955 at 962 and the Easley versus Cromartie case, 532 U.S. 234 at 242. That's the United States Supreme Court, 2001. The standard is clear error, which means that this court must be convinced, not that it would weigh the evidence differently than the district court, but arrive at a definite and firm conviction that the district court has committed a mistake. All right. Thank you, counsel. Can I follow up on just one thing? I was looking at the language of the court before. It says Aetna did not clearly inform Litvinick that it needed further objective neurological testing before it could be convinced that she had a cognitive disability due to multiple sclerosis. That's what the court found before. It said Aetna did not clearly inform Litvinick that it needed further objective neurological testing before it could be convinced that she had a cognitive disability. What obligation, in your view, did Aetna have to obtain that information? Aetna didn't have any obligation at all. Aetna may, but is not required to conduct any sort of investigation in that way. And in fact, what I find interesting is the testing that was done by the appellant's own treating physicians did not establish any impaired cognitive domains. In fact, the problem appellant has is that Aetna failed to discount certain medical evidence provided by the appellant from her own treating physicians, namely the neuropsych testing of Dr. McCleary and the mini mental status examination of Dr. Weiner, which was conducted in October of 2005. So, but in October of 2005, McCleary did the neurological testing. None was done after that by anybody. Yes, Your Honor. The testing was done in August and September of 2004, and then Dr. Weiner did a mini mental status examination in October of 2005, which is at the time of the appeal on this matter. And there was no recommendation by anybody for repeat testing. And in fact, prior to having done the testing, Ms. Levinick had been complaining about cognitive impairment. The testing failed to show any cognitive impairment. And in fact, the testing done by Dr. Weiner also failed to show cognitive impairment. But it showed the existence of the disease. Nobody questions that she had multiple sclerosis. MRIs are only going to show multiple sclerosis. They are not going to show the functional impairment. The EEG done by Dr. Weiner in, and I don't know the exact date it was in, either October or September of 2005, showed it was normal. I mean, the test results from the clinical findings and the objective information provided by the appellant's own treating physicians failed to support her disability. It's unclear. It may be that nobody wanted to have repeat site testing because it would have shown the exact same thing it had done, that there was no cognitive impairment. See, the problem that I have is that we really don't have an updated, any of these neurological testings done very current. And I'm trying to figure out whose fault is that. Is that her fault or Aetna's fault? It is plaintiff's responsibility, appellant's responsibility to prove that she is disabled. It is not Aetna's responsibility to either prove she's disabled or prove she's not disabled. And I think that if there, if, I mean, it was explained to her that it is inconsistent, and this is on the initial denial, it was inconsistent for Dr. Weiner to say she has cognitive impairment when the neuropsych testing showed otherwise, when his mini mental status examination showed otherwise. And on appeal, Dr. Weiner did not say why or explain why that neuropsych testing is either out of date or should not be relied upon. Okay. What's her situation now? In other words, what if she went out today and got a test and so she can't do this anymore? Well, now it's all gone. It had to have been done at that time. Thank you, counsel. We'll give you a minute to respond. And I am concerned, as you can tell, about the standard of review that we apply to the district court's determination that the Aetna should be given considerable discretion. We argued and based upon Montour that the choice and application of the standard of review is de novo, and that is Montour v. Hartford. And that is the basis of our appeal is that the court did not properly reduce its deference as required by a case law circuit or precedent in the circuit and by the Ninth Circuit decision. Real quick, I wish to respond to counsel's assertion that Aetna was not required to obtain the testing or obtain this testing. Plaintiffs supplied the information that was requested by Aetna. She completed the forms. She provided the medical evidence. She supplied the MRI testing. She did not go out and get additional testing. Again, Aetna did not believe that the evidence that she provided was sufficient. If that is the case, then it is Aetna's duty, who is a higher than marketplace fiduciary, to either order the testing, which it had the power to do under the policy, or directly tell her. There is nowhere in this record where Aetna told plaintiffs, you should go out and get more neurological testing. At best they can do is the voicemail message to Dr. Weiner's office saying, give us objective evidence, and actually what it said is an ongoing process. Now, in its briefing, Aetna emphasized this letter in November, November 17th, where it said, this is after the benefits were terminated, Aetna says, this is our request for objective evidence. Well, look at the letter. The letter says, give us objective evidence of the restrictions and limitations inherent in your condition. It did not say to show disability. It said inherent in your condition. So what was supplied? Dr. Weiner wrote a letter and explained how MS alters the tissue in the brain, interrupts the neurons, and how it affects someone's cognition. Plaintiffs supplied all of the information that was requested by Aetna. What disturbs this court, or at least what disturbs your honor about the request for information, it did not happen. And that is the problem here. If Aetna was going to insist on proving disability by neurological testing, it had the power and the duty to order that testing. But she says that they don't have to prove disability, that Aetna didn't have to prove disability, that the applicant had to prove disability. The applicant bears the burden of proving disability, but it did supply the proof requested by Aetna. If Aetna was going to insist on proving... And the proof was what? The proof was the completion of the APS forms, the narrative letters given that were requested by Aetna. She provided from both Dr. Spain and Dr. Weiner, a social security award, her medical reports, and let's look at the neurological testing that was done when she was still employed. She was still working when that was done. That testing revealed that formal testing said that she was under a high degree of emotional distress, and Dr. McCleary ordered that she, or recommended that she engage in psychological counseling. That's never been mentioned. Thank you, counsel. The case just argued is ordered and submitted.
judges: Beistline, Trott, Rymer